UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM JOHNSON, KELLY GRIFFIN, KEITH WESOLOWSKI, PETER JOHNSON and BRACKIE BRYANT et al. <br> Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> - against - <br><br> FANDUEL, INC., <br> a Delaware corporation, <br> - and - <br> DRAFTKINGS, INC. <br> a Delaware corporation, <br><br> Defendants. | Jury Trial Demanded <br><br> Case No. 15-cv-7963-GHW <br><br> Hon. Gregory H. Woods, U.S.D.J. <br> Hon. James L. Cott, U.S.M.J. |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs ADAM JOHNSON, KELLY GRIFFIN, KEITH WESOLOWSKI, PETER JOHNSON and BRACKIE BRYANT ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings"), (collectively "Defendants"), and state as follows:

**NATURE OF THE CASE**

1.      This is a class action complaint against FanDuel and DraftKings, two companies operating daily fantasy sports ("DFS") websites in a manner that violates Kentucky, Massachusetts, Florida and New York law, as well as analogous common and consumer protection laws in each state in which they operate.

2.      DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis. That is, Defendants operate tournaments where individuals accumulate points based on the real-life statistics of players in professional

sporting events that occur on a particular day.  Individuals can play for free or pay money to compete for cash prizes.

3.   The start of the 2015 NFL season saw a huge media blitz as Defendants spent more than $100,000,000 on television ads and became two of the top television advertisers in the United States.  As a result of this advertising blitz, Defendants added millions of new users. [1]

4.   Defendants make money on the fee they take from each entry into their contests. While the prize pools of these contests are funded from entry fees, Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

5.   The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

6.   DraftKings refers to its new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site.[2] According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.[3]

7.   The CEO of FanDuel also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.[4]

---

[1] http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/ (accessed Oct. 7, 2015)
[2] *Id.*; *see also* https://rotogrinders.com/threads/dk-frequent-player-points-130623; https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5; (accessed Oct. 7, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)
[3] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015)
[4] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (accessed Oct. 8, 2015)

8.     These material misrepresentations and omissions fraudulently induced Plaintiffs and the proposed classes to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

9.     Plaintiff Adam Johnson deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

10.     Plaintiff Brackie Bryant deposited $25 on FanDuel on September 20, 2015, and on DraftKings on September 17, 2015, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

11.     Plaintiff Kelly Griffin deposited $25 on DraftKings in April 2015, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

12.     Plaintiff Keith Wesolowski first deposited $200 on FanDuel in August 2014 and a total of $400 on FanDuel, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

13.     Plaintiff Peter Johnson deposited $25 on FanDuel on September 20, 2015, deposited money on DraftKings in September 2015 as well, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

**PARTIES, JURISDICTION AND VENUE**

14.     Plaintiff Adam Johnson is a resident of Jefferson County, Kentucky, and citizen of Kentucky.   He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

15.     Plaintiff Brackie Bryant is a resident of Dade County, Florida, and a citizen of Florida.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

16.     Plaintiff Kelly Griffin is a resident of Sacramento County, California, and a citizen of California.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

17.     Plaintiff Keith Wesolowski is a resident of Mecklenburg County, North Carolina, and a citizen of North Carolina.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

18.     Plaintiff Peter Johnson is a resident of Hillsborough County, New Hampshire, and a citizen of New Hampshire.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

19.     Defendant DraftKings, Inc., is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

20.     Defendant FanDuel, Inc., is a Delaware corporation with its principal place of business in New York, New York.

21.     This Court has subject matter jurisdiction over both the parties and the subject matter because a substantial number of the events giving rise to this complaint occurred in New York, including all activities of FanDuel and some or all of the concerted activities. Additionally,

the Southern District of New York is the proper venue for this action because FanDuel's headquarters are in the Southern District of New York and some of the events giving rise to the Complaint occurred here.

## FACTUAL BACKGROUND

A. **Daily Fantasy Sports**

22.     Defendants are able to operate their websites because they market DFS as a game of skill, like chess or the stock market.  It is also similar to pari-mutuel horse race wagering in that players compete against each other for prize pools and Defendants take their fee from the prize pool itself.

23.     Defendants held themselves out to Plaintiffs and the classes as places where their skill made a difference between winning and losing.  For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning."   In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train, and we win."

24.     Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

25.     In reality, most of the money on DFS sites goes to a few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the

2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[5]   An analysis done by Bloomberg showed a similar distribution heavily weighted towards the top 1% of players.[6]

## B.  Value of Inside Information and Data

26.    DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.  The players whose fantasy teams score the most points – based on the real statistics of those players in that game – win the most money.

27.    DFS is not gambling because of the skill involved in picking a winning team. According to DraftKings's CEO Jason Robins, DraftKings attracts players "who are analytical and favor data and research." Robins said: "They do their homework.  It's like the stock market. They enjoy looking at something and trying to figure out something that someone else doesn't see."[7]

28.    The biggest edges any player can have come from having data and information. DraftKings and FanDuel employees have access to both things, neither of which is public.  For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain strategies and even how lineups on FanDuel would do if they were entered into DraftKings contests.  DraftKings knows the value of this data and knows that it should not be shared: "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I

[5] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015).
[6] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 7, 2015)
[7] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing*, Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Oct. 7, 2015)

believe is not a positive thing… That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies. Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently. And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently."[8]  He went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[9]

29.     In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

30.     Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

31.     Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

32.     Indeed, a DraftKings employee accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestants' lineups

---

[8] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 7, 2015)
[9] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=7 (accessed Oct. 7, 2015)

were "locked" and could therefore still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[10]

33.     However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[11]  An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

34.     DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[12]

35.     In all, DraftKings employees have won at least $6,000,000 playing at FanDuel, which is more than one million dollars per year considering DraftKings is only a few years old.[13] The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

36.     DraftKings was well aware of its employees playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[14]

37.      FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.[15]

---

[10] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 7, 2015).
[11] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015).
[12] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)
[13] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015)
[14] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (Oct. 7, 2015)

38.     This FanDuel employee's screen name, PetrGibbons, hid his true identity and occupation at FanDuel from other players because his name was not actually Peter Gibbons.[16]

39.     Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."[17]

40.     In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

41.     Robins had previously discussed[18] any sort of issue that affected "game integrity" as fraud, and literally the first person to respond is the employee who won $350,000 on FanDuel:

---

[15] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015)
[16] Peter Gibbons is actually the name of the main character in the movie Office Space, in which employees at a software company engage in a scheme to steal money repeatedly from a large number of people in small quantities so as to avoid detection. This scheme, generally known as "salami slicing" was also the plot of Superman III. (*See* http://www.imdb.com/title/tt0151804/plotsummary)
[17] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)
[18] https://rotogrinders.com/threads/ok-industry-wide-concern-this-is-not-directed-at-any-single-85017?page=1 (accessed Oct. 7, 2015).

**JRobs**                                                              2 years ago



*DraftKings CEO*

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                              Reply Quote Link

**Ethan**                                                              2 years ago



*DraftKings Rep*

Awesome detailed response, Jason.

                                                              Reply Quote Link

42.     In that post, Robins uses the word "fraud" or "fraudster" nine times.  Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

43.     For instance, an analysis by DFS Report shows that PetrGibbons, the employee at FanDuel who works in product operations, is one of the top 50 players in all of DFS despite only playing on one site.[19]  While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on other sites. One of his jobs includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  While the article has been removed from FanDuel's website, a version is still on the Internet. In that article, the FanDuel employee profiling the FanDuel employee noted: "The fact Boccio does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy…or 10."[20]

44.     According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[21]

45.     FanDuel's CEO admitted to personally playing on competitor sites[22].

---

[19] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/ (accessed Oct. 7, 2015)
[20] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (Oct. 7, 2015)
[21] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015)
[22] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (Oct. 7, 2015)

46.     Had Plaintiffs and/or members of the proposed classes known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiffs and members of the proposed classes would not have played on Defendants' websites.

47.     Had Plaintiffs and/or members of the proposed classes known that Defendants had acted in concert to sanction this practice, Plaintiffs and members of the proposed classes would not have played on Defendants' websites.

48.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

49.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site, and in fact were playing and winning on their websites at a high rate.

50.     Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites, an action that Defendants had previously decided, in concert, not to take.

C.    **Invalidity of Arbitration Provision of Terms of Use**

51.     DraftKings's Terms of Use is not a valid, enforceable contract.

52.     Plaintiffs and the class were fraudulently induced into placing money onto DraftKings and FanDuel because they were lead to believe they would be competing in a fair game of skill without insiders or others using non-public information to compete against them.

53.     The so-called "Terms of Use" on DraftKings do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory. Indeed, there is no restriction

on DraftKings' ability to terminate the "agreement" or to refuse to perform. For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

54.     Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendant the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation.

55.     Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

56.     The Terms of Use purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

57.     In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

58.     The DraftKings Terms of Use are procedurally and substantively unconscionable.

59.     FanDuel's Terms of Use is not a valid and enforceable contract.

60.     FanDuel reserves the right, at its sole discretion, to modify or replace the Terms of Use at any time, except for the purported arbitration and waiver of class action rights provisions.  This constitutes an illusory contract that is unenforceable.

61.     The terms of FanDuel's arbitration, waiver of class action rights and right to trial by jury are unconscionable and Plaintiffs would not have agreed to those terms or deposited any money on FanDuel had they known about the fraudulent activity and misrepresentations as described in this Complaint.

62.     FanDuel offers customers a 30-day window to opt out of the arbitration and class action waiver provisions.

63.     Plaintiff Brackie Bryant, via undersigned attorney, sent notice to FanDuel via the address listed in the Terms of Use that he intended to opt out of the arbitration and class action waiver provisions within 30 days of his first use of the FanDuel service.  Therefore, Plaintiff Brackie Bryant can proceed against FanDuel on behalf of himself and the proposed classes, as described below, in this Court.

64.     Plaintiff Peter Johnson, via undersigned attorney, sent notice to FanDuel via the address listed in the Terms of Use that he intended to opt out of the arbitration and class action waiver provisions within 30 days of his first use of the FanDuel service.  Therefore, Plaintiff Peter Johnson can proceed against FanDuel on behalf of himself and the proposed classes, as

described below, in this Court.

65.     Plaintiffs' lineup data and other information constitutes personal intellectual property that Defendants, by and through its employees, has used to profit in violation of Plaintiffs' rights.

66.     As a direct and proximate result of the actions described above, Plaintiffs and members of the proposed classes have been damaged.

## CLASS ALLEGATIONS

67.     A class action is the proper form to bring Plaintiffs' claims under FRCP 23. The potential classes are so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the classes, and the representative parties will fairly and adequately protect the interests of the classes.

68.     This action satisfies all of the requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

69.     **Numerosity**: the Classes are so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  News accounts discuss how millions of users compete on the websites of Defendants.

70.     **Commonality:** the claims made by Plaintiffs meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a) Whether Defendants made the representations set forth above and substantially similar representations to Plaintiffs and members of the proposed classes;

b) Whether Defendants' advertisements were false, misleading or unfair;

c) Whether Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and if they breached those duties;

d) Whether Defendants fraudulently induced Plaintiffs and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

e) Whether consumers were harmed by Defendants' actions as described above;

f) Whether the Terms of Use on each Defendants' website are unconscionable, illusory, fraudulent or otherwise invalid;

g) The extent of the damages caused by Defendants' acts.

h) Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiffs and the proposed classes that these practices were occurring

71.   **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class member, was induced to use Defendants' sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

72.     The claims of the Class Representative Plaintiffs are furthermore typical of other Class members because they make the same claims as other class members. Plaintiffs have an interest in seeking compensation from Defendants.

73.     **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Classes. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Classes and the infringement of the rights and the damages they have suffered are typical of other Class members.

74.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

75.     The nature of this action and the nature of New York, Florida, Kentucky and Massachusetts laws available to Plaintiffs and the Classes make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class

member with superior financial and legal resources; the costs of individual suits could

unreasonably consume the amounts that would be recovered; proof of a common course of

conduct to which Plaintiffs were exposed is representative of that experienced by the Class and

will establish the right of each member of the Class to recover on the cause of action alleged; and

Individual actions would create a risk of inconsistent results and would be unnecessary and

duplicative of this litigation.

76.     The proposed classes and/or subclasses are described as follows:

> **"All persons in the United States who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."**

> **"All persons in the United States who deposited money into a FanDuel account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."**

> **"All persons in California, Florida, North Carolina, New Hampshire and Kentucky who deposited money into a FanDuel and/or DraftKings account before Oct. 6, 2015, and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site." (the California Subclass, Florida Subclass, North Carolina, New Hampshire and Kentucky Subclass, respectively)**

77.     Plaintiffs reserve the right to modify or amend the definition of the proposed

classes and to modify, amend or remove proposed subclasses, before the Court determines

whether certification is appropriate and as the parties engage in discovery.

78.     Plaintiffs will fairly and adequately protect the interests of the class. The interests

of the class representative are consistent with those of the other members of the classes. In

addition, Plaintiffs are represented by experienced and able counsel who have expertise in the

areas of tort law, trial practice, and class action representation.

79.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

80.     Excluded from the Class are:
   a.    Defendants and any entities in which Defendants have a controlling interest;
   b.    Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;
   c.    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;
   d.    All persons or entities that properly execute and timely file a request for exclusion from the Class;
   e.    Any attorneys representing the Plaintiffs or the Class.

## COUNT I – NEGLIGENCE

81.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

82.     Defendants owed duties to Plaintiffs and the proposed classes as users and paying customers of their site to use reasonable care to provide true, reliable and safe information and contests.

83.     Defendants breached their duties to Plaintiffs and the proposed classes by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiffs and the proposed classes.

84.     In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiffs and the proposed classes.

85.     Plaintiffs and the proposed classes justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

86.     Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiffs and the proposed classes on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiffs and the proposed classes competed.

87.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the proposed classes were damaged in an amount to be proven at trial.

## COUNT II – FRAUD AND MISREPRESENTATION

88.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

89.     Defendants made material representations that were false, that defendants knew were false or were reckless as to the veracity and made with the inducement for Plaintiffs and the class to act upon.

90.     Specifically, and as detailed above, Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiffs and the proposed classes' submissions would use this information to compete against Plaintiffs and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiffs' and the classes' ability to use skill to win.

91.     Plaintiffs and the proposed classes acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.

92.     Plaintiffs and the proposed classes would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against

individuals with insider knowledge, access and use of non-public data.

93.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiffs and the proposed classes to give them money in exchange for services and agreeing to the alleged contract.

94.     As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiffs and the proposed classes were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT III – VIOLATION OF KENTUCKY CONSUMER PROTECTION ACT

95.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

96.     Plaintiff Adam Johnson (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the Kentucky Subclass.

97.     The Kentucky Consumer Protection Act, KRS 367.120, *et seq.*, was enacted to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services.

98.     KRS 367.170 prohibits unfair, false, misleading or deceptive acts and/or practices in the conduct of any trade or commerce, including any unconscionable activities.

99.     Defendants are in the business of marketing, selling and promoting goods and services in Kentucky through television advertising, radio and internet advertising directly marketed, targeted and with the intent to reach Kentucky consumers, including Plaintiffs and the proposed classes.

100.    Plaintiff and the proposed classes are in privity with Defendants.

101.    Defendants' actions as described above are false, misleading, deceptive and/or

unconscionable, in violation of the Kentucky Consumer Protection Act.

102.    Plaintiff and the proposed classes have been damaged as a direct and proximate result of Defendants' violations of the Kentucky Consumer Protection Act.  Plaintiffs and members of the proposed classes are entitled to recover actual damages including but not limited to loss of value of their deposits, and other equitable relief pursuant to the Kentucky Consumer Protection Act.

## COUNT IV – CIVIL CONSPIRACY

103.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

104.    As detailed above, the Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

105.    Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiffs and the proposed classes, Defendants committed negligence and/or fraud.

106.    This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites and otherwise profit because of their unlawful activities.

107.    FanDuel knew that its employees played on DraftKings.  DraftKings knew that its employees played on FanDuel.

108.    Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

109.     As a direct and proximate result of Defendants' concerted actions, each

Defendant is liable to Plaintiffs and each and every member of the proposed classes.

## COUNT V - VIOLATION OF THE NEW YORK
## DECEPTIVE ACTS AND PRACTICES LAW
### (N.Y. GEN. BUS. § 349, *et seq.*)

110.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

111.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices in the state of New York by making the misrepresentations described above.

112.    The foregoing acts and practices were directed at consumers.

113.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the fair play available on their websites.

114.    Plaintiffs and members of the proposed classes were injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349 because they paid for entry into contests and deposited money onto Defendant' websites, which they would not have done had they known the true facts.

115.    Plaintiffs and the proposed classes seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, and reasonable attorneys' fees and costs.

## COUNT VI - VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW
### (N.Y. GEN. BUS. § 350, *et seq.*)

116.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

117.     By the acts and conduct alleged herein, Defendants committed false advertising in the conduct of business, trade or commerce in the state of New York contrary to the NYFAL, G.B.L. § 350, *et seq.*

118.     NYFAL defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." The foregoing acts and practices were directed at consumers. G.B.L. § 350-a.

119.     The foregoing false advertisements are misleading in a material way because they fundamentally misrepresent the fair play available on their websites.

120.     Plaintiffs and members of the proposed classes were injured as a direct and proximate result of Defendant' violation of NYFAL because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.

121.     Plaintiffs and the members of the proposed classes seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, and reasonable attorneys' fees.

## COUNT VII – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA)

122.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

123.     Plaintiff Brackie Bryant (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the Florida Subclass.

124.     At all times relevant hereto, the FDUTPA was in full force and effect.  Section 501.202 Fla. Stat. of FDUTPA provides in relevant part as follows:

The provisions of this part shall be construed liberally to promote the following policies:

(1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.

(2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

125.    Plaintiff and other members of the proposed classes, as defined above, are consumers within the meaning of the FDUTPA given that Defendant's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

126.    Section 501.204 renders unlawful the "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

127.    Defendants knowingly made material representations that were false, that defendants knew were false, were reckless as to the veracity, and/or should have known were false.  Defendants made these material representations for the purpose of inducing Plaintiff and the proposed classes to act upon them.   Plaintiff justifiably relied on these material misrepresentations.

128.    Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiff and the proposed classes' submissions would use this

information to compete against Plaintiff and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff and the proposed classes' ability to use skill to win.

129.   At all relevant times, Defendants misrepresented that their DFS contests were contests of skill when, in fact, the games were not contests of skill.

130.   Additionally, at all relevant times, Defendants failed to disclose to Plaintiff and the proposed classes the material fact that Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website and the material fact that, in turn, Defendants knowingly allowed their co-Defendant's employees to compete against their own players, including Plaintiff and the proposed classes, using material, non-public, valuable data and information.

131.   DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

132.   Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

133.   Prior to the disclosure of these material omissions and misrepresentations, Plaintiff and the proposed classes deposited money into a DFS account that Plaintiff and the proposed classes would not have deposited had they known of the material misrepresentations and material omissions made by Defendants.

134.   Defendants intended to be deceptive and/or unfair to Plaintiff and the proposed classes by intentionally making the foregoing false and misleading statements and omitting material information as alleged above, because had Defendant provided accurate information, Plaintiffs and the proposed class members would not have deposited money into Defendants'

daily fantasy sports accounts and would not have entered into the contest "of skill."

135.     Defendants' practices as described herein are both unfair acts and deceptive and are prohibited by FDUTPA.

136.     Plaintiff and the proposed class members justifiably relied on the misrepresentations and omissions to their detriment as described herein by depositing money into Defendants' daily fantasy sports accounts and playing DFS contests through Defendants.

137.     The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

138.     As a direct and proximate result of the foregoing, the Plaintiff and the proposed subclasses have been damaged in an amount to be determined at trial, including compensatory damages and other miscellaneous incidental and consequential damages.

139.     Plaintiff and the proposed subclasses seek damages, together with appropriate punitive damages, attorneys' fees, costs of suit pursuant to the FDUTPA as well as any equitable relief to enjoin Defendant from engaging in the wrongdoing described herein.

## COUNT VIII - VIOLATION OF CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE §§ 1750, *ET SEQ.*

140.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

141.     Plaintiff Kelly Griffin (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the California Subclass.

142.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale of goods or services to consumers.

27

143.     Plaintiff and each member of the California Subclass are "consumers" as defined by California Civil Code §1761(d).

144.     Defendants provide a "service" within the meaning of Civil Code §1761(b).

145.     Defendants violated the CLRA in at least the following respects:

a.     Cal. Civ. Code § 1770(a)(5): representing that goods or services have characteristics, uses, or benefits which they do not have;

b.     Cal. Civ. Code § 1770(a)(7): representing that goods or services are of a particular standard, quality, or grade if they are of another;

d.     Cal. Civ. Code § 1770(a)(9): advertising goods with intent not to sell them as advertised;  and

e.     Cal Civ. Code § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

146.     Defendants' acts and omissions constitute unfair, deceptive, and misleading business practices in violation of Civil Code §1770(a) as described throughout the Complaint.

147.     On October 14, 2015, Plaintiff notified Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations.

148.     If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of receipt of Plaintiff's written notice pursuant to §1782 of the California Act, Plaintiff will amend this Complaint to add claims for actual, punitive, statutory damages, and attorney fees pursuant to the CLRA.  Plaintiff and the California Subclass also will seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution, disgorgement, statutory

damages, attorney fees and any other relief that the Court deems proper.

149.    Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to the public.

## COUNT IX - CALIFORNIA UNFAIR COMPETITION LAW – CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*

150.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

151.    Plaintiff Kelly Griffin (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the California Subclass.

152.    Defendants engaged in unlawful, unfair, and/or fraudulent conduct under California Business & Professional Code § 17200, *et seq*.

153.    Defendants' conduct is unlawful in that it violates the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (as set forth in the previous cause of action).

154.    Furthermore, Defendants' conduct is unfair in that it offends established public policy as described herein, and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiff and the California Subclass.  The harm to Plaintiff and the California Subclass arising from Defendants' conduct outweighs any legitimate benefit Defendants derived from the conduct.  Defendants' conduct undermines and violates the stated spirit and policies underlying the Consumers Legal Remedies Act as alleged herein.

155.    Defendants' actions and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers.

156.    As a direct and proximate result of Defendants' violations, Plaintiff and the California Subclass have been damaged.

157.     Plaintiff and the California Subclass seeks equitable relief in the form of an order requiring Defendants to refund Plaintiff and the California Subclass all monies and injunctive relief in the form of an order prohibiting Defendants from engaging in the alleged misconduct and performing a corrective recall campaign.

## COUNT X - VIOLATION OF CAL. BUS. & PROF. CODE SECTION 17500, *ET SEQ.*— FALSE ADVERTISING

158.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

159.     Plaintiff Kelly Griffin (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the California Subclass.

160.     This cause of action is brought pursuant to the Unfair Competition Law at Business & Professions Code § 17500 *et seq.*

161.     Defendants disseminated advertising before the public in California that: (a) contained statements that were illegal, untrue, or misleading; (b) Defendants knew, or in the exercise of reasonable care should have known, were illegal, untrue or misleading; (c) concerned the personal property or services or their disposition or performance; and (d) was likely to mislead or deceive a reasonable consumer. The illegal, untrue and/or misleading statements and representations made by this Defendants include, but are not limited to:

(a)     DFS contests were contests of skill (when, in fact, the games were not contests of skill); and

(b)     DFS contests involved fair play without the potential for insiders to use non-public information to compete against them (when, in fact, employees and others persons with access to confidential, internal data were not just playing, but also winning large amounts of money on DFS sites).

162.    Defendants advertise through print and television media extensively in California. These advertisements contain some or all of the illegal, false and/or misleading statements and representations as alleged herein.

163.    Defendants advertise on the Internet in California. These advertisements contain some or all of the illegal, false, and/or misleading statements and representations as alleged herein and throughout the complaint.

164.    Pursuant to Business & Professions Code §§ 17203 and 17535, Plaintiff seeks restitution and the disgorgement of all monies or benefit paid by Plaintiff and the California Subclass to Defendants for the conduct described herein.

165.    Pursuant to Business & Professions Code §§ 17204 and 17535, Plaintiff seeks an order of this Court enjoining Defendant, and each of them, from continuing to make such illegal, misleading and/or untrue statements as described herein. The public will be irreparably harmed if such an order is not granted.

166.    Defendants' misrepresentations and omissions alleged herein were the type of misrepresentations and omission that are material—i.e., a reasonable person would attach importance to them and would be induced to act on that information.

167.    Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

168.    Defendants' false advertising is ongoing.   Unless restrained by this Court, Defendants could continue to engage in untrue and misleading advertising, as alleged above, in violation of Cal. Bus. & Prof Code §§ 17500, *et. seq.*

169.    As a result of the foregoing, Plaintiff and the California Subclass have been

injured and have lost money or property, and are entitled to restitution and injunctive relief.

## COUNT XI - UNFAIR AND DECEPTIVE TRADE PRACTICES - N.C. GEN. STAT. § 75-1, et seq.

170.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

171.    Plaintiff Keith Wesolowski (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the North Carolina Subclass.

172.    The North Carolina Unfair and Deceptive Trade Practices Act (hereinafter "UDTPA") is expressly intended to protect "consumers" like Plaintiff and Class Members from unfair or deceptive trade practices.

173.    Defendants are each a "person" within the meaning of the UDTPA and, at all pertinent times, was subject to the requirements and proscriptions of the UDTPA with respect to all of its business and trade practices described herein.

174.    Plaintiff and the proposed classes are "consumers" "likely to be damaged" by Defendant's ongoing deceptive trade practices.

175.    Defendants were engaged in practices affecting commerce by the actions described above within the meaning of N.C.G.S. §75-1.1.

176.    Defendants engaged in unfair and deceptive trade practices when they engaged in actions described above.

177.    Defendants' conduct as described above was likely to, and did in fact, deceive consumers including Plaintiff and the Class.

178.    Defendants willfully concealed, suppressed, omitted and failed to inform Plaintiff of the material facts as described above.

179.   Plaintiff and the proposed classes have suffered ascertainable losses as a direct result of Defendants' employment of unconscionable acts or practices, and unfair or deceptive acts or practices.

180.   As a direct and proximate result of the injury caused by the unfair and deceptive trade practices of the Defendants, the Plaintiff is entitled to relief, including actual and treble damages, under N.C.G.S. § 75-1.1 and 75-16. Further, the unlawful acts and omissions as set forth above were willful violations entitling Plaintiff to attorneys' fees, under N.C.G.S. § 75-16.1. Further, similarly situated members of the proposed classes are likewise entitled to remedies due to the injury they have suffered as a result of the unfair and deceptive trade practices.

## COUNT XII - UNFAIR AND DECEPTIVE TRADE PRACTICES - N.H. REV. STAT. § 358-A:1 et seq.

181.   Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

182.   Plaintiff Peter Johnson (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the New Hampshire Subclass.

183.   The New Hampshire Consumer Protection Statute, N.H. Rev. Stat. § 358-A:1 et seq. is expressly intended to protect consumers like Plaintiff and Class Members from unfair or deceptive trade practices.

184.   Defendants are each a "person" within the meaning of the § 358-A:1 et seq. and, at all pertinent times, was subject to the requirements and proscriptions of § 358-A:1 et seq. with respect to all of its business and trade practices described herein.

185.   Plaintiff and the proposed classes are consumers by Defendant's ongoing deceptive trade practices, and suffered similar injury as numerous other persons.

186.    Defendants were engaged in practices affecting commerce by the actions described above within the meaning of § 358-A:1 et seq.

187.    Defendants engaged in unfair and deceptive trade practices when they engaged in actions described above.

188.    Defendants' conduct as described above was likely to, and did in fact, mislead, confuse and deceive consumers including Plaintiff and the Class.

189.    Defendants willfully concealed, suppressed, omitted and failed to inform Plaintiff of the material facts as described above.

190.    Plaintiff and the proposed classes have suffered ascertainable losses as a direct result of Defendants' employment of unconscionable acts or practices, and unfair or deceptive acts or practices.

191.    As a direct and proximate result of the injury caused by the unfair and deceptive trade practices of the Defendants, the Plaintiff is entitled to relief, including actual damages or $1,000, whichever is greater, under § 358-A:10, and all other available damages under § 358-A:1 et seq.

## COUNT XIII - UNJUST ENRICHMENT

192.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

193.    Plaintiffs and the members of the proposed classes conferred a benefit on Defendants by depositing money and playing in contests on their websites.

194.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the members of the proposed classes' deposits and contest entries, which retention

under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fair play available on their websites.

195.    Plaintiffs and members of the proposed classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.  Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and the members of the proposed classes is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the members of the proposed class for their unjust enrichment, as ordered by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the proposed classes pray for relief and judgment against Defendants, as follows:

a.    For an order certifying the proposed classes, appointing Plaintiffs and their counsel to represent the proposed class and notice to the proposed classes to be paid by Defendants;

b.    For damages suffered by Plaintiffs and the proposed classes;

c.    For restitution to Plaintiffs and the proposed classes of all monies wrongfully obtained by Defendants;

d.    For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.    For Plaintiffs' reasonable attorneys' fees, as permitted by law;

g.    For Plaintiffs' costs incurred;

  h.  For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

  i.  For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

**JURY DEMAND**

  Plaintiffs demand a trial by jury on all counts so triable.

Dated: October 14, 2015  By:  s/ Paul C. Whalen
            Paul C. Whalen (PW1300)
            LAW OFFICE OF PAUL C. WHALEN, P.C.
            768 Plandome Road
            Manhasset, NY 11030
            (516) 426-6870 telephone
            (212) 658-9685 facsimile
            pcwhalen@gmail.com

            **JONES WARD PLC**
            Jasper D. Ward IV
            Alex C. Davis
            Marion E. Taylor Building
            312 S. Fourth Street, Sixth Floor
            Louisville, Kentucky 40202
            Tel. (502) 882-6000
            Fax (502) 587-2007
            jasper@jonesward.com
            alex@jonesward.com

            Counsel for the Plaintiffs and Proposed Classes